FILED

SEP 1 5 2010

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SCOTT R. KIMBALL,
          Plaintiff,

                                     CV 09-6251-PK

                                     FINDINGS AND
v.                                   RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,
          Defendant.
_____

PAPAK, Magistrate Judge:

      Plaintiff Scott Kimball filed this action September 4, 2009, seeking judicial review of a

final decision of the Commissioner of Social Security finding him not disabled and not entitled to

disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II

and XVI of the Social Security Act (the "Act"). This court has jurisdiction over Kimball's action

pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

      The sole issue in this appeal is whether the Administrative Law Judge erred in finding

Page 1 - FINDINGS AND RECOMMENDATION

that Kimball engaged in substantial gainful activity from September 2004 forward. For the reasons set forth below, the ALJ's decision should be reversed, and the case remanded for further proceedings.

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r for Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.*" Id., citing Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of the Commissioner. *See id., citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## PROCEDURAL BACKGROUND

Mr. Kimball filed an application for DIB and SSI benefits on April 8, 2003, alleging disability since December 1, 1997, from bipolar disorder and post-traumatic stress disorder

(PTSD). The applications were denied initially and on reconsideration. A hearing was held on July 19, 2005, before Administrative Law Judge ("ALJ") William Philip Horton. On October 25, 2005, the ALJ issued a decision in which he determined that Kimball's earliest possible onset date under the current application was March 14, 1999. The ALJ found Kimball not disabled. On October 27, 2006, the Appeals Council denied Kimball's request for review.

On February 13, 2008, Kimball filed a complaint for review before this court in case CV 06-6318-HU. Magistrate Judge Dennis James Hubel entered a Findings and Recommendation reversing and remanding the case for payment of benefits for the closed period from March 1999 to September 2004. The court also remanded for further proceedings on the issue of whether Kimball engaged in substantial gainful activity ("SGA") for the period of September 2004 forward. U.S. District Judge Anna J. Brown adopted those Findings and Recommendation on June 2, 2008.

On May 14, 2009, a hearing on remand occurred before ALJ John J. Madden, Jr. The ALJ issued a decision finding that Kimball had engaged in SGA since September 1, 2004 and denying Kimball's claim for benefits. Because the Appeals Council did not assume jurisdiction of this case, the ALJ's decision after remand became the final decision of the Commissioner. *See* 20 C. F. R. § 404.984. On September 4, 2009, Kimball filed a complaint for review of the ALJ's decision on remand. Kimball's briefing frames the issue before this court as follows: "Did the ALJ err in finding that the plaintiff was not working under special conditions, thereby rebutting the presumption that his work is substantial gainful activity?" (Pl.'s Brief, #14, at 12).

//

//

Page 3 - FINDINGS AND RECOMMENDATION

## FACTUAL BACKGROUND

Kimball was born October 27, 1965. Tr. 261.[1] He has a high school education and two years of college. *Id.* Kimball has worked as shipping and receiving worker, caretaker, taxi driver, tree trimmer helper, delivery driver, and woodworking shop hand. Tr. 293-95. Kimball was first hospitalized in 1991 after standing in a busy street with an unloaded gun to his head and was subsequently diagnosed with Schizotypal Personality. Tr. 214-220. In December, 1997, Kimball was diagnosed with "Bipolar I Disorder, Most Recent Episode Manic, Severe with Psychotic Features." Tr. 146.

In March, 2003, Kimball applied for disability insurance benefits and supplemental security income benefits, alleging a disability date of December 1, 1997. Tr. 66-75, 93-95. He cited Bipolar Disorder and Post Traumatic Stress Disorder as conditions limiting his ability to work and wrote that "[I] [c]annot tolerate stress. I can work occasionally, but regular work leads to anxiety, depression, mania, psychotic thinking. I get suicidal." Tr. 67. In a Work History Report completed in June, 2003, Kimball wrote that "at times I can work just fine, but inevitably the symptoms build up and I become unable to function for periods of time. " Tr. 83.

In August, 2003, Kimball was examined by Dr. Shellman, a psychologist, who diagnosed him with "Bipolar I disorder, most recent episode depressed, moderate." Tr. 190. Kimball had reported cycles of mood swings involving agitation, confusion, anger, and depression, and several instances of mania per year. Tr. 187.

Ultimately, in September, 2003, Kimball's application for benefits was denied. Tr. 39. In

---

[1] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 11.

a functional capacity assessment, a psychologist wrote that "[Kimball] has the ability to sustain a normal workday/week, performing simple, predictable tasks, would function best w/only occas [sic] interaction w/coworkers and public." Tr. 195.

Starting in July of 2004, Kimball began working as an assistant in the woodworking shop at Boston Cabinets, a company owned by Robert Holvey. *See* Tr. 273.

In June, 2005, Dr. Kalnins, a psychiatrist who had treated Kimball for the past several years, summarized Kimball's condition. Tr. 228. She wrote that although he enjoyed periods with fewer mood swings and disturbing thoughts, he had never experienced prolonged relief from his symptoms. *Id.* She noted that antidepressant medications were not effective in stopping Kimball's frequent violent images and thoughts, particularly about people he interacted with. *Id.* Concerning Kimball's ability to work, she wrote: "Scott has been able to do limited work, but only because he has had an unusual amount of flexibility with the jobs. . . . Most recently, he has been working for a cabinetmaker. So far, his boss is extremely flexible with Scott's work hours, but this may not be sustainable over the long term." *Id.*

Also in June, 2005, Kimball was evaluated by Dr. David Truhn, a pyschologist. Dr. Truhn noted that Kimball experienced wariness and fear when depressed. Tr. 229. Truhn also reported Kimball's manic episodes, occurring once every two to three years. Tr. 229-230. Additionally, Kimball reported experiencing auditory hallucinations when he was depressed, which made him believe that he was "crazy" and not going to "accomplish anything." Tr. 230. Kimball reported that much of the time he felt like something was controlling him beyond his conscious control, and at those times he avoided work and public interactions to avoid entering a major depressive or manic episode. *Id.* Dr. Truhn concluded that "Mr. Kimball is experiencing

symptoms of a severe and persistent mental illness that has been affecting his interactions socially, vocationally, and academically for most of his adult life. It seems that his ability to maintain consistent competitive and [sic] employment is significantly impaired." Tr. 238. In a Mental Residual Functional Capacity Report, Truhn also noted Kimball had "[m]arkedly limited" ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and  "[m]arkedly limited" ability to complete a normal workday without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 240.

On July 19, 2005, an appeal hearing was held where the ALJ heard testimony from Kimball and Vernon Arne, a vocational expert. Kimball testified that he initially had done some yard work for Holvey, but when Kimball mentioned that he had a hard time finding work, Holvey said he might have some work in his cabinet shop for Kimball. Tr. 273. Kimball began working for Holvey at Boston Cabinets in July, 2004. Tr. 273. He described his employment status as a subcontractor,  and asserted that he was responsible for reporting his own taxes and received no benefits or medical insurance from Boston Cabinets. Tr. 275. Kimball's duties included assembling drawers, sanding, puttying, cleaning up the shop and delivering frames and doors to be sanded. Tr. 272-3. Kimball usually worked for about five hours per day, five days per week. Tr. 274-275. Holvey had one other employee who worked two days a week, eight hours a day, overlapping in the shop with Kimball. Tr. 274.

While working together, Kimball testified that he became good friends with Holvey, sharing his experiences of major depression, which Holvey understood because Holvey had also experienced depression at times in his life. Tr. 278. Kimball also shared other information about

his symptoms of manic depression, including mania, agitation, and anxiety. *Id.* Kimball testified that, consequently, Holvey was "very helpful with allowing me to take time off when I need or come in late or leave early." *Id.* Kimball noted that "I doubt very seriously that this kind of job would work if it were [sic] for someone who didn't offer that flexibility." *Id.* Kimball also testified that for the past several years, he had found that he had to limit his work to 20 to 25 hours "or else I'll just – it'll just be too much stress." Tr. 275.

During the winter when his symptoms were worse Kimball would sometimes come to work at 10:00 AM or noon. Tr. 279. Although Kimball tried to call Holvey when he was coming late, some days he would not notify him. *Id.* Other days, Kimball would take off early because he was feeling stressed out. *Id.* Kimball left early a couple of times a week during some periods. *Id.* On average, Kimball estimated that he came in late about four to five days a month. Tr. 280. Kimball would document the hours he worked in a calendar in the Boston Cabinets shop. Tr. 279.

The vocational expert testified that a typical work day requires on-time attendance and working five days a week and seven and a half to eight hours per day. Tr. 299. Typically, an individual could miss one or two days of work per month and still remain employed. Tr. 300. Finally, the vocational expert testified that giving an individual the freedom to come and go as needed in the workplace would be considered an accommodation. *Id.*

In addition to the testimony, the ALJ received as exhibits Kimball's applications, wage information from Boston Cabinets, work history reports, disability reports, and medical and psychological records. Included in those exhibits was a letter dated July 18, 2005, from Robert Holvey, the owner of Boston Cabinets, stating: "I am aware of Scott's bi-polar disorder. Because

of his disorder I have given him the freedom to come and go as needed.  He works approximately 20-25 hours per week." Tr. 142.

In a decision issued on October 25, 2005, the ALJ found that, based on Kimball's earning information, Kimball had been engaged in substantial gainful activity for the past year and continued to engage in SGA through the date of the hearing.  Tr. 15.[2]

In June, 2008, the district court found that the ALJ erred in his decision.  Tr. 326-365. The court determined that Kimball proffered rebuttal evidence on the factors of whether his work was done under special conditions and how well he did that work.  Tr. 348; *See* 20 C.F.R. §§ 404.1573 , 416.973 (listing "How well you perform" and "If your work is done under special conditions" among other factor to consider in determining whether a job constitutes SGA).  In particular, Kimball presented evidence about his employer's special consideration due to his bi-polar disorder, including allowing Kimball to work limited hours and come and go at will, which the vocational expert considered an accommodation.  Additionally, the court found that Kimball had presented other evidence challenging the presumption of SGA, including medical evidence from Dr. Truhn and Dr. Kalnins of Kimball's limited ability to maintain employment, carry out instructions, maintain concentration, maintain attendance, sustain ordinary routines, and complete a normal work week.  Tr. 348-349.  The court then found that by making no reference to Mr. Holvey's evidence concerning the special consideration given to Kimball in performing his job, the ALJ committed clear error.  Tr. 349.[3]  Thus, the district court remanded for further

---

[2]The ALJ also made a contradictory finding that Kimball "had not engaged in substantial gainful activity since the alleged onset of disability." Tr. 19.

[3]The court made several other important findings, including accepting the opinions of doctors Kalnins and Truhn as true, Tr. 356, and crediting Kimball's testimony as true, Tr. 360.

Page 8 - FINDINGS AND RECOMMENDATION

proceedings on the issue of SGA for the period of September 2004 forward.  Tr. 361.

After the hearing, Kimball continued working for Boston Cabinets, earning $11,387.50 in 2005, $9,070 in 2006, $12,792 in 2007, and $8,240 in 2008, according to pay records provided by the owner.  Tr. 396-401.

Notes from a doctor visit in May, 2008, stated that Kimball was employed part time in a job "which it sounds is able to withstand his various episodes of hypomania and mania. He is able to miss up to a couple of weeks at a time and still return to it. He also finds a lot of support there."  Tr. 423.  Also, an April, 2009, mental residual functional capacity questionnaire completed by Kimball's treating mental health nurse practitioner Libby Churchill noted that Kimball had a "[m]arkedly limited" ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and "[m]oderately limited" ability to sustain an ordinary routine without special supervision.  Tr. 428.

In May, 2009, the owner of Boston Cabinets, Mr. Holvey, completed a questionnaire prepared by Kimball's counsel.  There, Holvery asserted that Kimball is an independent contractor.  Tr. 404.  Holvey wrote that he became aware of Kimball's medical problems through their friendship and work conversations.  Tr. 405.  Holvey noted that he gave Kimball accommodations at work, such as the "freedom to come and go as needed [and the] [a]bility to take days off when needed."  Tr. 405.  Holvey wrote that Kimball takes advantage of these accommodations every day.  Tr. 405.  Further, Holvey described Kimball's difficulty completing

---

The court also noted that evidence from Dr. Truhn's eval supported the inference that Kimball's ability to work depended upon having a sympathetic employer.  Tr. 354 n.4.

tasks: "When working on a project sometimes he will stop 3/4 or 7/8 of the process and stop and leave all materials and tools at his station- in other words he does not put anything away when he leaves." Tr. 406. Holvey also stated that he periodically completed tasks that Kimball didn't finish because Kimball had left work due to his symptoms: "On numerous occasions I will complete his tasks if his project is required to complete a job or in the way and takes up space." Tr. 406.

On May 19, 2009, ALJ John J. Madden, Jr. held a hearing on remand focused on the issue of whether Kimball engaged in SGA after September 2004. Tr. 434. The ALJ admitted exhibits including the questionnaire completed by Holvey, updated medical records, and wage information from Boston Cabinets. *See* Tr. 435. At the hearing, Kimball was the sole witness. He testified that he receives no medical coverage or benefits from Boston cabinets and that Holvey describes Kimball as a subcontractor, not an employee. Tr. 436.

Kimball explained that he has no definite schedule, but usually goes in around noon and works for three to four hours. Tr. 436. Kimball described wanting to work more hours and make more money, but in order to maintain a basic level of psychological health, he limits his hours to a steady rate of two to four hours a day. Tr. 437-438. Kimball explained that he leaves early when he feels a tremendous amount of stress, nervousness, racing thoughts, anger, and problems with memory to the extent that he has a hard time doing simple tasks. Tr. 442. Kimball explained that Holvey never asks him to leave work early. Tr. 446. Overall, Kimball misses about four to five days a month and works less hours on other days. Tr. 443. Also, there have been periods when Kimball missed three days in a row from work because he did not feel able to work. Tr. 443.

Page 10 - FINDINGS AND RECOMMENDATION

Kimball also explained that soon after starting work at Boston Cabinets, Holvey told

Kimball that Holvey had also experienced depression and that depression was something Holvey

and Kimball had in common. Tr. 447. Kimball expressed that Holvey was able to understand

Kimball's depression and at least empathize with Kimball's manic symptoms. Tr. 447.

Kimball also testified about the effects of his irregular schedule. He said that he stops

projects before completing them all the time, and that when he was feeling bad and left early,

Holvey would end up finishing his work. Tr. 447. Kimball described that there have been many

times when he needed to get something done but had to leave. Tr. 447-448. In those situations,

Holvey ended up having to do a lot of extra work to finish the projects that he probably didn't

want to do. *Id.* Kimball noted that he had never worked for or subcontracted with someone who

has shown the same type of flexibility as Holvey. Tr. 448. Finally, Kimball testified that he

would see himself deteriorating if he were forced into a schedule because of his symptoms. Tr.

453.

## ANALYSIS

**1.    Disability**

To establish disability within the meaning of the Act, a claimant must demonstrate an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected . . . to last for a continuous period of not

less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step

sequential process for determining whether a claimant has made the requisite demonstration. *See*

*Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only

at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the ALJ considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b), 416.920(a)(4)(i), 416.920(b).

## 2.    Substantial Gainful Activity

### a.    Presumption of SGA From Wages

Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or are intended to be done, for pay or profit. *See* 20 C.F.R. §§ 404.1510, 404.1572, 416.910, 416.972. Work done during any period in which a claimant believes she is disabled may show that she is able to engage in SGA. 20 C.F.R. §§ 404.1571, 416.971.

There are two distinct methods for evaluating whether a claimant's work shows that she is able to do substantial gainful activity. *See* 20 C.F.R. §§ 404.1574, 416.974 (evaluation method for employees); 20 C.F.R. § 404.1575, 416.975 (evaluation method for self-employed individuals). For employees, the amount of a claimant's earnings can give rise to a rebuttable presumption that a claimant has or has not been engaged in SGA. *See* 20 C.F.R. §§ 404.1574(b)(2), 416.974(b)(2). By contrast, when a claimant's average monthly earnings are less than the applicable SGA earnings level, the Commissioner will presume that the work activity did not constitute SGA, and will not consider other information in addition to claimant earnings

in the absence of evidence indicating that the claimant is otherwise engaging in SGA or is affirmatively controlling and limiting the amount of wages he or she is receiving. *See* 20 C.F.R. §§ 404.1574(b)(3)(i), 404.1574(b)(3)(ii), 416.974(b)(3)(i), 416.974(b)(3)(ii).

For self-employed individuals, however, wages are not the sole measure of SGA, but are considered along with the value of the individual's activities to her business. 20 C.F.R. §§ 404.1575(a)(2), 416.975. Specifically, the regulations provide three separate tests to determine SGA. The first test inquires whether the individual renders "services that are significant to the operation of the business and receive[s] a substantial income from the business." 20 C.F.R. §§ 404.1575(a)(2)(i), 416.975(a)(1). The second test analyzes whether the individual's "work activity, in terms of factors such as hours, skills, energy output, efficiency, duties, and responsibilities, is comparable to that of unimpaired individuals in your community who are in the same or similar businesses as their means of livelihood." 20 C.F.R. §§ 404.1575(a)(2)(ii), 416.975(a)(2). The third test investigates whether the individual's "work activity, although not comparable to that of unimpaired individuals, is clearly worth the amount shown in [SGA wage standards for employees] when considered in terms of its value to the business, or when compared to the salary that an owner would pay to an employee to do the work you are doing." 20 C.F.R. § 404.1575(a)(2)(iii), 416.975(a)(3). If the individual has not engaged in SGA under test one, then tests two and three are used. 20 C.F.R. § 404.1575(a)(2), 416.975(a).

Here, the ALJ correctly analyzed SGA under the method for employees described in 20 C.F.R. §§ 404.1574 and 416.974. In doing so, the ALJ compared Kimball's earnings with the

appropriate SGA levels and presumed SGA based on earnings.[4]  *See* Tr. 308-310.

### b.      Rebutting the Presumption of SGA

The district court's order in this case directed the ALJ to determine whether Kimball

engaged in SGA from September 2004 forward.  Tr. 365.  A presumption of SGA arising from

wages is rebuttable based on analysis of five factors, including: (1) the nature of the claimant's

work; (2) the claimant's performance; (3) any special conditions under which the work is

performed; (4) whether the claimant is self-employed; and (5) the amount of time the claimant is

able to spend at work.  *See* 20 C.F.R. §§ 404.1573, 416.973; see also *Katz v. Secretary of Health

and Human Servs.*, 972 F.2d 290, 293 (9th Cir. 1992) (citing regulations and listing factors that

claimant could use to overcome high-earnings presumption).  Here, the ALJ erred in failing to

analyze the other factors besides special conditions which could rebut the presumption of SGA.

### i.      Nature of Work

The ALJ failed to analyze whether the nature of Kimball's work shows he has the ability

to engage in SGA.  The regulations state: "If your duties require use of your experience, skills,

supervision and responsibilities, or contribute substantially to the operation of a business, this

tends to show that you have the ability to work at the substantial gainful activity level."  20

C.F.R. §§ 404.1573, 416.973.  The record suggests that Kimball's work for Boston Cabinets

contributed to the operation of the business.  At the cabinet workshop, Kimball assembled

drawers, sanded, applied putty, delivered frames and doors to be sanded, and cleaned up the

---

[4] The ALJ found that Kimball's wages in 2005, 2006, and 2007 exceeded the SGA levels
for those years.  Tr. 309.  The ALJ also found that although Kimball's 2008 wages fell below the
SGA threshold, he retained the capacity to engage in SGA at the same level as the previous years.
*Id.*  Moreover, Kimball concedes that his earnings since September, 2004 trigger a presumption
that he engaged in SGA.

shop, all of which contributed to the operation of the business. *See* Tr. 272-273. Additionally, Mr. Holvey stated that he would finish Kimball's tasks when Kimball left them incomplete "if his project is required to complete a job or in the way and takes up space." Tr. 406. This account suggests that Kimball's work was necessary to the completion of the cabinets made at the workshop. Thus, this factor suggests Kimball has the ability to engage in SGA.

### ii.    Performance

The ALJ also failed to explicitly analyze whether Kimball's work performance shows he has the ability engage in SGA. The regulations state:

> We consider how well you do your work when we determine whether or not you are doing substantial gainful activity. If you do your work satisfactorily, this may show that you are working at the substantial gainful activity level. If you are unable, because of your impairments, to do ordinary or simple tasks satisfactorily without more supervision or assistance than is usually given other people doing similar work, this may show that you are not working at the substantial gainful activity level. If you are doing work that involves minimal duties that make little or no demands on you and that are of little or no use to your employer, or to the operation of a business if you are self-employed, this does not show that you are working at the substantial gainful activity level.

20 C.F.R. §§ 404.1573; 416.973. The record reflects that Kimball's mental illness hindered his work performance significantly, to a degree that Kimball required assistance from Holvey to complete his tasks. For example, Dr. Truhn wrote: "It seems that [Kimball's] ability to maintain consistent competitive and [sic] employment is significantly impaired." Tr. 238. Dr. Truhn also noted that Kimball had "[m]arkedly limited" ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and  "[m]arkedly limited" ability to complete a normal workday without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods. Tr. 240.

Holvey's responses also indicate that Kimball's limitations detracted from his performance at work. Holvey noted that "[w]hen working on a project sometimes [Kimball] will stop 3/4 or 7/8 of the process and stop and leave all materials and tools at his station." Tr. 406. Additionally, Holvey frequently had to assist Kimball by completing jobs that he had left unfinished. Tr. 406. The ALJ reasoned that Holvey's comments about Kimball's incomplete work "do not go to the quality of the claimant's work, but rather to the owner's desire that the claimant be available for more work than he presently performs." Tr. 310. There is, however, no support in the record for that conclusion. If anything, the record suggests that Holvey's comments acknowledged Kimball's erratic performance, but excused it because of Kimball's impairment. Thus, this factor raises the inference that Kimball is unable to engage in SGA.

### iii.    Special Conditions

The Social Security Administration regulations specifically list six "examples" of special conditions relating to a claimant's impairment:

> (1) You required and received special assistance from other employees in performing your work;
> (2) You were allowed to work irregular hours or take frequent rest periods;
> (3) You were provided with special equipment or were assigned work especially suited to your impairment;
> (4) You were able to work only because of specially arranged circumstances, for example, other persons helped you prepare for or get to and from your work;
> (5) You were permitted to work at a lower standard of productivity or efficiency than other employees; or
> (6) You were given the opportunity to work despite your impairment because of family relationship, past association with your employer, or your employer's concern for your welfare.

20 C.F.R. §§ 404.1573, 416.973. Finding that a claimant performed work under special

conditions does not end the inquiry into whether the claimant engaged in SGA. *See* 20 C.F.R. §§ 404.1573(c), 416.973(c) ("work done under special conditions may show that you have the necessary skills and ability to work at the substantial gainful activity level."); *Sharkey v. Comm'r, SSA*, 2008 U. S. Dist. LEXIS 60819, at *14-16, 133 Soc. Sec. Rep. Service 567, (D. Idaho 2008) ("not all work performed under special conditions will be placed outside of the substantial gainful activity category . . . special conditions are simply a factor for the ALJ to consider"); *cf. Abrahamson v. Astrue*, No. CV-07-1650-PHX-JAT, 2009 U.S. Dist. LEXIS 24011, at *6–7 (D. Ariz. Mar. 26, 2009) ("The mere fact that [plaintiff] engaged in SGA under special conditions is not dispositive of whether Plaintiff is in fact disabled."). Although the ALJ applied the correct legal standards[5] in evaluating whether Kimball worked under special conditions, there is not substantial evidence in the record to support the ALJ's finding that Kimball did not work under special conditions.

### (1)    Special Assistance in Performing Work

The ALJ's finding that Kimball does not require and receive special assistance in performing his work from other employees is not supported by substantial evidence. The ALJ reasoned that Kimball does not require special assistance from other employees as result of his mental impairment because Boston Cabinets has only one other part-time employee and Kimball therefore performs his work without assistance when that employee is not in the shop. Tr. 310. The ALJ also dismissed Holvey's reports that he sometimes cleans up the shop after Kimball has

---

[5] Along with analysis of the six enumerated examples of special conditions, the ALJ also addressed whether Kimball requires "special supervision due to his impairments." Tr. 309. While special supervision is not listed in the regulations as an example of special conditions, it could still be relevant to determining whether Kimball worked under special conditions.

left for the day or completes projects that Kimball left unfinished, characterizing these as "special circumstances, such as meeting an imminent deadline or creating more space in the shop." Tr. 310. In fact, Holvey wrote that he finished tasks or cleaned up after Kimball "[o]n numerous occasions," Tr. 406, indicating that Kimball required and received assistance from Holvey more frequently than acknowledged by the ALJ. Since Holvey is both the owner and primary employee of Boston Cabinets, the special assistance he rendered to Kimball is precisely the type described in this example indicating work under special conditions. *See* Tr. 447-448 (Holvey finishing Kimball's cabinet preparation and cleaning when Kimball left work). Thus, the ALJ erred in his finding that "claimant's work at Boston Cabinets is not performed within a 'sheltered' or other special condition." Tr. 310.

### (2)   Irregular Hours or Frequent Rest Periods

Regarding the second example, the ALJ found that although Holvey's accommodations of allowing Kimball freedom to come and go and to take days off when needed were indicative of a "sheltered workshop," they were also consistent with Kimball's status as subcontractor who received no medical insurance or retirement benefits from Boston Cabinets. Tr. 309-310. There is insubstantial evidence in the record to support the ALJ's finding that Kimball's flexible work schedule was not indicative of working under special conditions.

Although I need not conclusively resolve this issue here, the record suggests that Kimball was an employee of Boston Cabinets, not an independent contractor. First, the ALJ's analysis under the regulation used for employees (20 C.F.R. § 404.1574) indicates a reasoned decision that Kimball was an employee, not an independent contractor. Moreover, plaintiff persuasively argues that Kimball does not meet the definition of an independent contractor under Oregon law

Page 18 - FINDINGS AND RECOMMENDATION

because Kimball did not own his own business and work for others in addition to Mr. Holvey. *See* Or. Rev. Stat. 670.660.

Further, the structure of the regulations indicates that while a claimant's employment status is one factor in determining her ability to engage in SGA, employment status is not relevant in the narrower analysis of whether she worked under special conditions. *See* 20 C.F.R. §§ 404.1573, 416.973 (listing as separate factors "If you are self-employed"and "If your work is done under special conditions"). Thus, Kimball's potential status as an independent contractor does not diminish the overwhelming evidence in the record that Holvey allowed Kimball to work under flexible conditions to accommodate Kimball's mental illness.

Reports from mental health professionals indicate that Kimball viewed his flexible schedule as his employer's special accommodation of his symptoms. *See* Tr. 228 ("Scott has been able to do limited work, but only because he has had an unusual amount of flexibility with the jobs. . . . Most recently, he has been working for a cabinetmaker. So far, his boss is extremely flexible with Scott's work hours, but this may not be sustainable over the long term); Tr. 232 ("He said he works about 25 hours a week and averages five hours a day. He said some days he does not show up for work and he is able to come in late or leave early if he is depressed or 'hypersensitive.'").

Kimball's testimony at the two hearings also confirms that Holvey's flexibility was an accommodation to Kimball's mental illness. *See, e.g.,* Tr. 278 (Holvey was "very helpful with allowing me to take time off when I need or come in late or leave early. You know, I don't know if, actually I doubt very seriously that this kind of job would work if it were for someone who didn't offer that flexibility."); Tr. 279 (testimony that Kimball tried to call Holvey when he was

coming in late or missing work suggests that Kimball relied on Holvey's permission in working an irregular schedule); Tr. 442 (testimony that Kimball decides to leave early when he experiences Bipolar symptoms shows that his work schedule is an accommodation based on his impairment).

Additionally, Holvey's own writings clarify that he extends flexibility to Kimball because of his mental illness, not because of his employment status. *See* Tr. 142 ("I am aware of Scott's bi-polar disorder. Because of his disorder I have given him the freedom to come and go as needed. He works approximately 20-25 hours per week."); Tr. 405 (under the question "Have their been accommodations or allowances of any kind made?" Holvey writes: "Freedom to come and go as needed. Ability to take days off when needed.").

Finally, a vocational expert characterized Holvey's acceptance of Kimball's irregular attendance as an accommodation rather than a feature of competitive employment. Tr. 300; *see* Tr. 349 (Judge Hubel acknowledging the testimony of the vocational expert as part of Kimball's rebuttal evidence concerning work done under special conditions).

The record here is susceptible of only one rational interpretation: that Holvey allowed Kimball to work irregular hours on account of his mental illness. Because this scenario closely resembles the example of special conditions identified by 20 C.F.R. §§ 404.1573(c)(2) and 416.973(c)(2), the ALJ erred in his finding that "claimant's work at Boston Cabinets is not performed within a 'sheltered' or other special condition." Tr. 310.

### (3)    Special Equipment

The ALJ correctly opined that there was no indication in the record that Kimball requires special equipment. Tr. 310.

Page 20 - FINDINGS AND RECOMMENDATION

### (4)    Specially Arranged Circumstances

The ALJ also correctly observed that the record showed there were no specially arranged circumstances to help Kimball get prepared for or to and from work.  Tr. 310.

### (5)    Lower Standards of Productivity

Although the ALJ did not make findings directly on lower standards of productivity, the fact that Kimball was one of only three people working at Boston Cabinets makes any productivity comparisons between employees very difficult.

### (6)    Opportunity to Work Because of Family Relationship, Past Association with Employer, or Employer's Concern for Welfare.

The ALJ reasoned that Kimball's job does not appear to be based on family relationship or past association with Holvey because Holvey found out about Kimball's mental impairment only after the two men started working together and became friends.  Tr. 310.  In this regard, the ALJ misstated the legal standard, ignoring the third clause of 20 C.F.R. §§ 404.1573(c)(6) and 416.973(c)(6).  *See* 20 C.F.R. §§ 404.1573(c)(6), 416.973(c)(6) ("You were given the opportunity to work despite your impairment because of family relationship, past association with your employer, or *your employer's concern for your welfare*") (emphasis added).  Nevertheless,  the ALJ did not err in rejecting this example as indication of work under special conditions.

The regulations' use of the ambiguous phrase "given the opportunity to work" suggests two possible interpretations.  First, a special condition may exist only when an employer hires the claimant already knowing of her impairment.  Alternatively, a special condition may also occur when the employer continues to employ the claimant, despite poor performance, because the employer learned of the claimant's impairment sometime after hire.  Here, the evidence in the

record indicates that Holvey learned of Kimball's mental illness only through their relationship in the shop at Boston Cabinets, but not before Kimball started working at Boston Cabinets.  Tr. 278, 404, 405.  Thus, adhering to the first of these two rational interpretations of the regulations, the ALJ correctly found that Holvey did not grant Kimball the opportunity to work because of his concern for his welfare.

### iv.   Self-Employment

The regulations provide that "supervisory, managerial, advisory, or other significant personal services . . . perform[ed] as a self-employed individual" indicate an ability to engage in SGA.  20 C.F.R. §§ 404.1573(d), 416.973(d).  Since the evidence in the record and the ALJ's choice of the employee method of SGA wage calculation both indicate that Kimball was not self-employed, this factor does not apply and the ALJ did not err by excluding it from his analysis.

### v.   Time Spent at Work

The ALJ erred in failing to analyze the amount of time Kimball spent at work as an indication of his ability to engage in SGA. The regulations provide:

> While the time you spend in work is important, we will not decide whether or not you are doing substantial gainful activity only on that basis. We will still evaluate the work to decide whether it is substantial and gainful regardless of whether you spend more time or less time at the job than workers who are not impaired and who are doing similar work as a regular means of their livelihood.

20 C.F.R. §§ 404.1573(e); 416.973(e).  Here, Kimball's testimony shows that he works about three hours a day, five days a week. Tr. 440.  Moreover, Kimball testified that he would like to work more hours, but in order to maintain a basic level of psychological health, he limits his hours to a steady rate of two to four hours a day. Tr. 437.  There is no evidence in the record

comparing Kimball's time working to that spent by other workers in the same field. Moreover, the small size of Boston Cabinets makes meaningful comparison with other co-workers impossible. Thus, this factor is neutral in determining whether Kimball engaged in SGA.

In sum, the ALJ erred in finding that Kimball engaged in SGA since September 1, 2004. First, the ALJ erred in finding that Kimball did not work under special conditions. In fact, the record demonstrates that Kimball's work arrangement fits within two different examples of special conditions described in the regulations: requiring and receiving special assistance from other employees, and being allowed to work irregular hours. Second, the ALJ erred in analyzing only one factor (special conditions) of the five factors relevant to SGA described in 20 C.F.R. §§ 404.1573 and 416.973. The record shows that two factors suggest Kimball did not engage in SGA (performance, special conditions), one factor suggests Kimball did engage in SGA (nature of work), one factor is irrelevant (self-employment activities), and one factor is neutral (time spent at work).

3.    **Remand**

"The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The general rule is that when an administrative agency abuses its discretion or exceeds its statutory authority, a court should remand the matter to the agency for further consideration. *Moisa v. Barnhart*, 367 F.3d 882 (9th Cir. 2004) (citing *UOP v. United States*, 99 F.3d 344, 351 (9th Cir. 1996)). However, remand for additional investigation is inappropriate when properly credited testimony

establishes the issue in dispute and no further agency expertise or evaluation is needed. *See id.* at 887.

Remand on the issue of whether Kimball rebutted the presumption of SGA from September, 2004 forward would be inappropriate. The facts concerning Kimball's SGA rebuttal factors are fully developed, since two prior ALJ hearings thoroughly explored the accommodations Kimball received from Mr. Holvey and Kimball's vocational limitations. In the first hearing, the ALJ neglected to consider facts in the record suggesting that Kimball rebutted the presumption of SGA. In the second hearing, the ALJ acknowledge those facts, and much additional evidence, yet still erred in finding no special conditions and omitting analysis of the remaining factors relevant to SGA. A third hearing to enlarge the factual record on this same issue is unnecessary.

Moreover, no further agency evaluation is needed on the issue of whether Kimball rebutted the presumption of SGA. The record clearly shows two of three dispositive factors weigh in favor of finding that Kimball did not engage in SGA. First, Kimball's job performance indicates he did not engage in SGA; he required more supervision and assistance from Holvey than ordinary employees and his erratic attendance was permitted only on account of his impairment. Second, Kimball's work under special conditions shows he did not engage in SGA; he received special assistance from Holvey in finishing projects and was allowed to work irregular hours. Therefore, I find as a matter of law that Kimball has rebutted the presumption that he engaged in SGA starting in September, 2004.

Although the plaintiff suggests that the district court's findings in the previous appeal

require remand of this case for an immediate award of benefits, I disagree. In the previous

appeal, the district court found that the ALJ erred in the first hearing by rejecting lay and expert

testimony. There, the court noted that *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996) held

that improperly rejected evidence should be credited and an immediate award of benefits may be

made when: 1) the ALJ has failed to provide legally sufficient reasons for rejecting such

evidence, 2) there are no outstanding issues that must be resolved before a determination of

disability can be made, and 3) it is clear from the record that the ALJ would be required to find

the claimant disabled were such evidence credited. Tr. 361. Applying that test, the court found

that the three conditions described in *Smolen* were met with respect only to the closed period

between March 1999 and September 2004. Tr. 361; CV 06-6318-HU, #20, at 36. Concerning

the first hearing, the court also noted "[t]he ALJ continued the analysis for step two, presumably

for the closed period of March 14, 1999 to September 2004." *Id.* Moreover, in the second

hearing, the ALJ halted his analysis at step one after determining that Kimball engaged in SGA

starting in September 2004. Tr. 311. Thus, neither previous ALJ hearing proceeded past step

one in the disability analysis concerning the period at issue here, September 2004 onward.

Consequently, there are outstanding issues to resolve at the administrative level before a

determination of disability can be made for the period starting in September 2004.

## CONCLUSION

For the reasons set forth above, I recommend that the Commissioner's final decision be

reversed and remanded for further proceedings consistent with the discussion above. Regarding

the period from September 2004 forward, the Commissioner must begin with step two and

proceed through the remainder of the five-step process.  A final judgment should be entered pursuant to sentence four of 42 U.S.C. § 405(g).

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 15th day of September, 2010.

Honorable Paul Papak
United States Magistrate Judge